IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PAUL G. PARSONS, | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-22-105 |
| PRIESTER AVIATION, LLC, | § § § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Paul Parsons worked as a pilot for Priester Aviation, a commercial aviation company based in Wheeling, Illinois. Priester assigned Parsons to a trip in Thailand in June 2021. Parsons believed that this trip would be in violation of Federal Aviation Administration regulations and reported this to a Priester employee. Priester fired Parsons the following day, before the scheduled trip. Parsons alleges that firing him breached Priester's employment obligations to him, wrongfully retaliated against him for refusing to perform illegal acts, and resulted from age discrimination.

Priester moved to dismiss the breach of contract and wrongful termination claims. Parsons responded and Priester replied. Based on the pleadings; the motion, response, and reply; the applicable law; and the arguments of counsel, the court grants in part and dismisses in part the motion to dismiss, (Docket Entry No. 12). The reasons are explained below.

**I.    Background**

Parsons is a 65-year-old commercial pilot and resident of Texas. (Docket Entry No. 1 at 3). Priester is an Illinois commercial aviation company with its principal place of business in

Wheeling, Illinois. (Docket Entry No. 1 at 1). Parsons was hired by Priester as a pilot in March 2013. (Docket Entry No. 1 at 3).

On June 21, 2021, Parsons was stationed in Thailand. Priester notified Parsons that he would be piloting a flight to another city in Thailand on June 24. (Docket Entry No. 1 at 3). On June 22, Parsons learned that the aircraft owner would not be on the flight. (Docket Entry No. 1 at 3). Parsons alleges that the aircraft owner planned on allowing groups to fly on the owner's plane on an ongoing basis without the owner onboard. (Docket Entry No. 1 at 3–4). Parsons alleges that if the aircraft owner is not onboard, the flight is treated as one by a common or commercial carrier, not by a private or noncommercial carrier. (Docket Entry No. 1 at 4). Parsons alleges that if the aircraft owner is not on the flight, the company and pilot must follow the more stringent requirements for common or commercial carriers under the Code of Federal Regulations, Part 135 of Title 14. Otherwise, the flight would be under the Code of Federal Regulations, Part 91 of Title 14, which governs private and noncommercial carriers, and has less stringent operating requirements. (Docket Entry No. 1 at 4). Parsons alleges that because neither he nor the aircraft were certified to operate under Part 135 of Title 14 of the Code of Federal Regulations, he believed that the flight would violate those regulations and would involve "cabotage," or the right to operate transport services within a particular area. (Docket Entry No. 1 at 4). Parsons alleges that he believed that the flight would also violate Priester's Standard Operating Procedures Manual, which explains that "[a]ll trips carrying passengers will be flown under FAR 135 unless the specific aircraft owner(s) is/are on board the aircraft he/she owns. If an owner(s) is being flown in an aircraft other than his/her aircraft, it is a FAR 135 flight." (Docket Entry No. 16-1 at 1). On June 22, 2021, Parsons notified James Schnell, a Priester employee, that he believed that this flight would be illegal. (Docket Entry No. 1 at 4).

2

Priester fired Parsons on June 23, 2021. (Docket Entry No. 1 at 4). Parsons did not receive a verbal or written warning. (Docket Entry No. 1 at 4). Parsons argues that he was fired for refusing to fly an aircraft in violation of federal regulations and cabotage laws, and because he is an older pilot, close to "aging out." (Docket Entry No. 1 at 5).

Priester told Parsons that it fired him for bringing an unauthorized individual on the plane without the owner's approval. (Docket Entry No. 1 at 4). Parsons explains that this person was onboard to help with cleaning the aircraft, a pilot responsibility. (Docket Entry No. 1 at 4). Parsons argues that no Priester policy or statement in its manuals requires a pilot to receive approval before taking anyone on the plane, making this reason pretextual. (Docket Entry No. 1 at 4–5).

Parsons sued Priester for breach of contract, wrongful termination, and age discrimination. Priester moves to dismiss the breach of contract and wrongful termination claims, arguing that Parsons was an at-will employee and that he was not fired for refusing to perform a criminal act.

## II.     The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin

3

to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Lincoln v. Turner*, 874 F.3d 833, 839 (5th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

**III.     Analysis**

    **A.     The Breach of Contract Claim**

When a federal court sits in diversity jurisdiction, it applies the conflicts-of-law rules of the forum state, in this case, Texas. *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 532 (5th Cir. 2020). Absent a valid choice-of-law agreement, Texas courts apply the "most significant

4

relationship" test of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS. *Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400, 403 (5th Cir. 2004). Before applying this test, a court must determine whether there is a conflict between Texas law and other potentially applicable law. *See Sava Gumarska in Kemijska Industria D.D. v. Advanced Polymer Sciences, Inc.,* 128 S.W.3d 304, 314 (Tex. App.—Dallas 2004, no pet.) ("[W]e should first determine if the laws are in conflict. If the result would be the same under the laws of either jurisdiction, there is no need to resolve the choice of law question."). "'[I]f the laws of the states do not conflict, then no choice-of-law analysis is necessary,' and [courts] simply apply the law of the forum state." *Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620 (5th Cir. 2005). Parsons argues that Illinois law applies. Priester argues that Texas law applies.

Texas law presumes in favor of at-will employment. *Heggemeier v. Caldwell Cty., Texas*, 826 F.3d 861, 870 (5th Cir. 2016) (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 862 (5th Cir. 1999)). That presumption applies unless the relationship has been expressly altered by contract or "by express rules or policies limiting the conditions under which an employee may be terminated." *Muncy v. City of Dallas, Tex.*, 335 F.3d 394, 398 (5th Cir. 2003). Parsons alleges that Priester's Operations Manual and Standard Operating Procedures Manual altered the employment relationship, and that Priester breached the employment agreement by not following its manual.

"Texas law 'general[ly] reject[s] the claim that employment manuals issued unilaterally by an employer can per se constitute written employment contracts and create specific limitations which take the cases out of the at-will doctrine.'" *Heggemeier*, 826 F.3d at 871 (quoting *Zimmerman v. H.E. Butt Grocery Co.*, 932 F.2d 469, 471 (5th Cir. 1991)). "Where no express reciprocal agreement dealing with procedures for discharge are included, employee handbooks

5

constitute no more than general guidelines and do not create contractual rights in employees." *Garcia v. Reeves Cty., Tex.*, 32 F.3d 200, 203–04 (5th Cir. 1994).

Parsons alleges that his offer of employment letter stated that he would be hired as a pilot "as outlined in [Priester's] Operations Manual and Standard Operating Procedure Manual." (Docket Entry No. 1 at 3). He alleges that he "accepted the Offer of Employment in Texas as stated in the March 19, 2013 Offer of Employment." (Docket Entry No. 1 at 3). Parsons's claim for breach is based on the termination procedures in the manual, which provided for a verbal and written warning before termination.

Priester attached the offer of employment to the motion to dismiss, which may be considered at the motion to dismiss stage because it is referred to in Parsons's complaint and central to his claim. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). Priester agrees that the court may also consider the policy manual that Parsons attached to his response to the motion to dismiss because Parsons "relies on the [manual] as an integral part of [his] claim." (Docket Entry No. 20 at 9).

The offer of employment states that :

> If you accept our offer of employment, the following terms and conditions will apply.
> Your initial job responsibilities are as follows:
> Pilot, as outlined in Operations Manual and Standard Operating Procedure Manual.

(Docket Entry No. 12-1 at 1). The letter then states that "Your employment will not be for a specific duration or term, and it is understood that your employment is voluntary in nature and is employment-at-will. Therefore, either party may terminate the employment relationship at any time." (Docket Entry No. 12-1 at 1).

6

The employment letter shows that Priester's policy manual provided guidelines about the position, but was not an express reciprocal agreement about termination. Even if the language that Parsons's responsibilities were as "outlined in Operations Manual and Standard Operating Procedure Manual" incorporated obligations from the manual into the offer, the letter unequivocally shows that those obligations did not change the status of his at-will employment.

Parsons's claim for breach relies on the failure to follow the progressive disciplinary policy in the manual, which states:

> Failure to comply with this SOP Manual or any of the above mentioned directives will result in the following actions:
>
> 1). First offense:    Verbal warning by Chief Pilot;
> 2). Second offense:   Written warning entered into the individual's personnel file;
> 3). Third Offense:    Removal from duty or termination of employment.

(Docket Entry No. 16 at 5). Employment rules that "provide for progressive disciplinary procedures, such as verbal warning for the first breach; written warning for the second breach; and discharge for the third breach," are not enough on their own to create an express agreement to be bound by those policies. *Reynolds Mfg. Co. v. Mendoza*, 644 S.W.2d 536, 537–38 (Tex. App.—Corpus Christi 1982, no pet.). Without more, the language of this policy does not alter the at-will employment presumption. Parsons has not stated a claim for breach under Texas law.

The at-will presumption also applies under Illinois law, but Illinois requires less definite terms to rebut the presumption. In *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill.2d 482 (1987), the Illinois Supreme Court concluded that an employee handbook created contractual terms. In *Duldulao*, the employee handbook provided that:

> Permanent employees could be terminated only with "proper notice and investigation." The amendments to the handbook provided that "[p]ermanent employees are never dismissed without prior written admonitions and/or investigation that has been properly documented." Except in the case of extremely

7

> serious offenses, the handbook required three warning notices before a permanent employee could be dismissed.

*Id.* at 316. The court explained that an employee handbook may create enforceable rights where

> (1) "the language of the policy statement . . . contain[s] a promise clear enough that an employee would reasonably believe that an offer has been made."
> (2) "the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer."
> (3) "the employee must accept the offer by commencing or continuing to work after learning of the policy statement."

*Id*. The court concluded that the employee handbook created contractually enforceable rights. *Id.*

In *Unterschuetz v. City of Chicago*, 803 N.E.2d 988 (Ill. App. Ct. 2004), a former employee of the City of Chicago sued for breach of contract based on city ordinances that created the merit employment system for city employees. The plaintiff argued that under *Duldulao*, the expected protections of the merit system induced him into employment, and the mutual promises to abide by those policies constituted consideration. *Id.* at 993. The court explained that the employee handbook was distinguishable from the statutes at issue, which the legislature was entitled to change at any time and therefore could not be the basis of a contractual obligation. *Id.* The merit system laws "simply announce various policies that the City intends to carry out until such time as the city council wishes to change those policies." *Id.* at 994. The court explained that "an employee handbook, by definition, governs the relationship between employer and employee," so the relevant question is whether a handbook makes contractual policies or "sets out current working policies that are subject to change." *Id.* at 995. The court explained that the promises in *Duldulao* were specific and contingent on the employee's continued work. *Id.* at 995–96. The court highlighted the language in the *Duldulao* handbook that termination "cannot occur" without following the policies for termination, that permanent employees "are never dismissed" without following the policy procedures, and that notice was "required" before dismissal. *Id.* at 995.

Even under Illinois law, the language in the Priester employee handbook falls short of creating a contractual obligation. The manual explains the failure to follow the policies "will result in" the disciplinary procedures. (Docket Entry No. 16-1 at 1). This can be read as a warning of the consequences for failing to follow the policies, but falls far short of the "required" "never" and "cannot occur" mandates in *Duldulao*. The court in *Unterschuetz* also noted that *Duldulao* was the only case the parties cited that involved a de facto employment contract. *Unterschuetz*, 803 N.E.2d at 985. Courts have interpreted *Duldulao* as limited to "proper circumstances" and have required a plaintiff to show why his or her case is within those circumstances. *See e.g.*, *Dopkeen v. Whitaker*, 926 N.E.2d 794, 800 (Ill. App. 2010). Parsons has not shown that the policy manual should be interpreted in the same way as in *Duldulao*.

Parsons also points to a Safety Policy Letter dated April 2, 2021, explaining that Priester has a Safety Management System that includes a "non-punitive confidential event reporting system," designed to provide "a safe and secure environment for each employee to disclose breaches in safety and compliance." (Docket Entry No. 16-1 at 3). The letter explains that "[n]o action will be taken against an employee of Priester Aviation as long as the act was not willful, criminal, or negligent." (Docket Entry No. 16-1 at 3). Priester responds that this is a description of the internal reporting system, which has a nonpunitive reporting policy. This policy is dated eight years after the offer letter, so it cannot have been the basis of the agreement between Parsons and Priester. And the fact that this was issued years later as a "statement of policy" indicates that it "sets out current working policies that are subject to change," rather than a contractual obligation. *See Unterschuetz*, 346 Ill. App. 3d at 73.

Parsons fails to state a claim for breach of contract under either Texas or Illinois law.

9

### B. The Wrongful Termination or Retaliatory Discharge Claim

Parsons argues that Illinois law applies to his retaliatory discharge claim and Priester argues that Texas law applies.

Parsons alleged that Priester assigned him to an overnight flight without the owner onboard, which would be a violation of FAR 135 and would constitute illegal cabotage. Parsons alleges that he told a Priester employee that the flight would be illegal and that Priester fired him the following day for refusing to take the flight assignment. (Docket Entry No. 1 at 6–7). Priester argues that it fired Parsons for having an unauthorized person on the aircraft.

Illinois law provides for a retaliatory discharge claim when the employee's "discharge was in retaliation for certain actions that are protected by the public policy of Illinois." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 940–41 (7th Cir. 2002). "In order to make out a claim for retaliatory discharge, a plaintiff must allege: (1) that he or she has been discharged; (2) in retaliation for his or her activities; and (3) that the discharge violates a clear mandate of public policy." *Stebbings v. Univ. of Chicago*, 726 N.E.2d 1136, 1140 (2000). Illinois courts have concluded that when "an employee is fired for refusing to engage in illegal conduct or reporting the illegal conduct of others ('whistle blowing' or 'citizen crime fighting')," the public policy prong is met. *Brandon*, 277 F.3d at 941. For example, in *Palmateer*, the plaintiff was fired for reporting a possible criminal violation by a coworker to the police and agreeing to cooperate with the investigation. *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 877 (Ill. 1981). The court held that public policy protected the "citizen crime fighter." *Id.* at 880. The plaintiff needs to have only a reasonable, good-faith belief that a particular law is being violated. *Stebbings*, 726 N.E.2d at 1141. Parsons has plausibly alleged that he was discharged in retaliation for refusing to participate in conduct that he believed illegal.

Priester argues that Parsons's belief was unreasonable because "FAR 135 has absolutely nothing to do with the owner's presence on board the plane." (Docket Entry No. 20 at 11). Priester argues that under FAR 91 "a private aircraft owner is expressly permitted to fly guests on his plane. (Docket Entry No. 20 at 12). FAR 135 does not apply to "[f]lights conducted by the operator of an airplane for his personal transportation, or the transportation of his guests when no charge, assessment, or fee is made for the transportation." 14 C.F.R. § 91.501(b)(4). FAR 91 does not define "owner" or "operator," but FAR 1 defines "operate" as: "With respect to aircraft, means use, cause to use or authorize to use aircraft, for the purpose of air navigation including the piloting of aircraft, with or without the right of legal control (as owner, lessee, or otherwise)." 14 C.F.R. § 1.1. Part 1 distinguishes between an owner and an operator. Parsons was an operator under that definition. Section 91.501(b)(4) does not mention the guests of the owner, but only mentions the guest of an operator. Parsons points to Priester's Standard Operating Procedure Manual, which instructs that a flight carrying passengers without an owner on board must operate under Code of Federal Regulations Part 135. (Docket Entry No. 16-1 at 1).

> FAR 135 provides in pertinent part that:
>
> (a) Each person operating an aircraft in operations under this part shall
> (1) While operating inside the United States, comply with the applicable rules of this chapter; and
> (2) **While operating outside the United States**, **comply with Annex 2**, Rules of the Air, to the Convention on International Civil Aviation **or the regulations of any foreign country, whichever applies,** and with any rules of parts 61 and 91 of this chapter **and this part that are more restrictive than that Annex or those regulations and that can be complied with without violating that Annex or those regulations**. Annex 2 is incorporated by reference in § 91.703(b) of this chapter.

The parties disagree over whether this section means there is a presumption that Part 135 applies in foreign airspace. Priester first argued that the "whichever applies" language means that FAR 135 does not apply outside the United States, but rather that only Thai law or Annex 2 would apply.

11

(Docket Entry No. 12 at 16). In reply, Priester argues that Part 135 does not apply unless Parsons can show that Thai law or Annex 2 are less restrictive than FAR 135. (Docket Entry No. 20 at 12–13). Parsons argues that FAR 135 applies unless there is a conflict with the Thai regulations or Annex 2. (Docket Entry No. 16 at 18–19).

The parties' arguments about the applicability of FAR 135 bear on the reasonableness of Parsons's belief that he was asked to do an illegal act. At the pleading stage, the court need not decide whether FAR 135 banned the flight, or whether Parsons could have legally flown the plane under Part 91. Under Illinois law, Parsons needed to plausibly allege only that he reasonably believed that the flight violated the law, and he has done that.

Texas recognizes a narrower exception to at-will employment, "allowing employees to sue their employers if they are discharged 'for the sole reason that the employee refused to perform an illegal act." *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 659 (Tex. 2012), as corrected (June 8, 2012) (citing *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985)). A wrongful termination claim under *Sabine Pilot* requires the plaintiff to prove that: (1) he was required to commit an illegal act that carries criminal penalties; (2) he refused; (3) he was discharged; and (4) the sole reason for his discharge was his refusal to commit the unlawful act. *White v. FCI USA, Inc.,* 319 F.3d 672, 676 (5th Cir. 2003) (citing *Sabine Pilot,* 687 S.W.2d at 735). The employee has the burden of proving that his termination was for no reason other than refusing to perform the illegal act. *Sabine Pilot,* 687 S.W.2d at 735.

*Sabine Pilot* provides a claim only for those who are asked to commit a crime, and does not apply to whistleblowers. *Ed Rachal Found. v. D'Unger*, 207 S.W.3d 330, 332 (Tex. 2006). Although at least one Texas state court has concluded that *Sabine Pilot* applies when "an employee has a good faith belief that her employer has requested her to perform an act which may subject

her to criminal penalties," *Johnston v. Del Mar Distrib. Co.*, 776 S.W.2d 768, 771 (Tex. App. 1989), *writ denied* (Jan. 31, 1990), the majority of Texas courts disagree. *See e.g.*, *Camunes v. Frontier Enters., Inc.,* 61 S.W.3d 579, 581 (Tex. App.—San Antonio 2001, writ denied). "[I]n order for Plaintiff to prevail on a *Sabine Pilot* claim, a court would have to find that [he] refused to commit an act that would actually have subjected [him] to criminal penalties." *Marren v. Stout*, 930 F Supp. 2d 675, 681 n.2 (W.D. Tex. 2013) (collecting cases). As one court explained, "[w]e cannot, consistent with well-established Texas precedent, agree that a cause of action exists when termination follows the refusal to do a legal act*."* *Mayfield v. Lockheed Eng'g & Scis. Co.*, 970 S.W.2d 185, 187–88 (Tex. App.—Houston [14th Dist.] 1998, writ denied).

Although Texas and Illinois both have exceptions to the employment at-will presumption to prevent employers from firing employees for refusing to commit an illegal act, the state laws diverge as to whether the employee must show that the act that he refused to commit was criminal, or instead whether he held a good faith (even if incorrect) belief that the act was criminal. Parsons alleged the basis for his belief that the trip would violate "FAR 135 and constitute illegal cabotage." (Docket Entry No. 1 at 6). This is sufficient to state a claim under Illinois law. Priester responds that Parsons cannot show that the alleged conduct would actually carry criminal penalties, as required under Texas law. Parsons points to 49 U.S.C. § 46316, which imposes criminal penalties for violations of aircraft regulations. Parsons has not pointed to specific or sufficient facts to allow this court to conclude, at this early stage, that the flight would have violated FAR 135 or another federal regulation carrying criminal penalties. Nor has Priester identified a sufficient basis for the court to conclude on this record that the flight would not actually have carried criminal penalties. Because the court cannot conclude that the result would be the same under Texas or Illinois law, the court must apply the choice-of-law analysis.

Texas courts resolve conflicts-of-law in tort claims by applying the "most significant relationship" test set forth in the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS. *Carrillo v. Tifco Indus., Inc.*, 547 F. App'x 419, 422 (5th Cir. 2013) (citing *Gutierrez v. Collins,* 583 S.W.2d 312, 318–19 (Texas 1979) ("[I]t is the holding of this court that in the future all conflicts cases sounding in tort will be governed by the 'most significant relationship' test as enunciated in Sections 6 and 145 of the RESTATEMENT (SECOND) OF CONFLICTS.")). A common law claim for retaliatory discharge is a claim sounding in tort. *Safeshred*, 365 S.W.3d at 661.

Section 6 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS states:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (Am. L. Inst. 1971). For tort cases, the Restatement instructs courts to consider the following factors in determining which state possesses the most significant relationship:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include
    (a) the place where the injury occurred,
    (b) the place where the conduct causing the injury occurred,
    (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and,
    (d) the place where the relationship, if any, between the parties is centered.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (Am. L. Inst. 1971).

Parsons's injury is his loss of employment, which happened while he was in Thailand. Priester is an Illinois corporation with its principal place of business in Illinois. Parsons alleges that Priester made both the offer to employ him and the decision to terminate him in Illinois. Priester argues that the conduct giving rise to the termination and the termination itself occurred in Thailand, that the parties have different states of domicile, and that there is not a single state where the parties' relationship was centered. Priester's General Operations Manual and Standard Operating Procedures were drafted and are maintained in Illinois. At some point before he received the assignment to fly within Thailand, Parsons was instructed to fly from Illinois to Thailand. Illinois has a substantial interest in having its employment laws apply to Priester, an Illinois corporation. *Carrillo*, 547 F. App'x at 423.

Priester argues that the § 6 factors counsel in favor of applying Texas law. Priester relies on the Texas forum's familiarity with Texas law and the interests in certainty, predictability, and uniformity of result. But the comments to § 145 explain that "the values of certainty, predictability and uniformity of result are of lesser importance in torts than in areas where the parties and their lawyers are likely to give thought to the problem of the applicable law in planning their transactions." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. b (Am. L. Inst. 1971). Although it might be easier for a Texas court to determine and apply Texas law, this is outweighed by the Illinois interests in having Illinois employment law applied to an Illinois company in an employment dispute arising out of a disputed employment decision made in Illinois. The parties had substantial contacts with Illinois, where Priester was incorporated and located, where Priester decided to hire Parsons, where Parsons's trip to Thailand originated, and where Priester decided

15

to fire Parsons. The court concludes that Illinois law applies and that Parsons has sufficiently stated a claim for retaliatory discharge.

## IV. Conclusion

The motion to dismiss filed by Priester Aviation, LLC, (Docket Entry No. 12), is granted as to the breach of contract claim and denied as to the wrongful termination claim.

SIGNED on May 12, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge